UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT E.,<br><br>                        Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>                        Defendant. | Case No.: 19cv2132-RBB<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 24] AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [ECF NO. 25]** |

On November 6, 2019, Plaintiff Scott E.[1] commenced this action against Defendant Andrew Saul, Commissioner of Social Security, for judicial review under 42 U.S.C. § 405(g) of a final adverse decision for disability insurance benefits [ECF No. 1]. Defendant filed the Administrative Record on January 27, 2020 [ECF No. 12]. On June 18, 2020, Plaintiff consented to have a United States magistrate judge conduct all

---

[1] The Court refers to Plaintiff using only his first name and last initial pursuant to the Court's Civil Local Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

proceedings in this case, and on June 24, 2020, the case was referred to me [ECF No. 22].[2]  On July 15, 2020, Plaintiff filed a Motion for Summary Judgment [ECF No. 24]. Defendant filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment on August 21, 2020 [ECF No. 25].  Plaintiff filed a Reply in Support of Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion on August 31, 2020 [ECF No. 26].

For the following reasons, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

Plaintiff Scott E. was born on August 21, 1965, earned a bachelor's degree from San Diego State University in industrial technology, and previously worked as a machinist.  (Admin. R. 336, 408, 1024, ECF No. 12.)[3]  On or about May 24, 2012, Scott E. filed an application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively.  (Id. at 336-45.)  He alleged that he had been disabled since November 20, 2006, due to a brain tumor/acoustic neuroma (noncancerous tumor on nerve between inner ear and brain, also known as vestibular schwannona);[4] multiple endocrine neoplasia 1 ("MEN 1") endocrine cancer (rare genetic disorder that causes tumors in the endocrine glands and parts of the small intestine and stomach, in which endocrine glands release excessive amounts of hormones

---

[2] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in cases of this nature.
[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.
[4] See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/acoustic-neuroma/symptoms-causes/syc-20356127 (last visited Feb. 12, 2021).

that can lead to disease);[5] pituitary adenoma (abnormal growth in pituitary gland that may affect hormone levels);[6] adrenal gland hyperplasia (disorder of adrenal glands impacting production of hormones);[7] error calcium metabolism (described by Plaintiff as calcification of muscle and tissue); chondrocalcinosis (calcification of cartilage);[8] pseudogout (form of arthritis caused by crystal deposits within a joint);[9] pernicious anemia (vitamin B-12 deficiency);[10] absence of iron stores in bones; daily headaches; and intermittent gastro pancreatic pain.  (Id. at 383.)

Plaintiff's application was denied on initial review and again on reconsideration.  (Id. at 167-71, 177-82.)  An administrative hearing was conducted on October 16, 2014, by Administrative Law Judge ("ALJ") Robert Iafe, at which Plaintiff, medical expert Edwin L. Bryan, M.D., and vocational expert Katie T. Macy-Powers, M.S., testified.  (Id. at 86-109, 145.)  On June 30, 2015, the ALJ held a supplemental hearing and Plaintiff Scott E., medical expert Lowell L. Sparks Jr., M.D., and vocational expert Macy-Powers testified.  (Id. at 145.)[11]  The ALJ issued a decision finding Plaintiff not disabled on September 12, 2015.  (Id. at 145-56.)  On March 22, 2016, the Appeals Council for the Social Security Administration granted Plaintiff's request for review, vacated the hearing decision, and remanded the case to the ALJ.  (Id. at 163-66.)  Judge Iafe then held

---

[5] See id., https://www.mayoclinic.org/diseases-conditions/men-1/symptoms-causes/syc-20353064 (last visited Feb. 12, 2021).
[6] See id., https://www.mayoclinic.org/diseases-conditions/pituitary-tumors/symptoms-causes/syc-20350548 (last visited Feb. 12, 2021).
[7] See id., https://www.mayoclinic.org/diseases-conditions/congenital-adrenal-hyperplasia/symptoms-causes/syc-20355205 (last visited Feb. 12, 2021).
[8] See Science Direct, https://www.sciencedirect.com/topics/medicine-and-dentistry/chondrocalcinosis (last visited Feb. 12, 2021).
[9] See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pseudogout/symptoms-causes/syc-20376983 (last visited Feb. 12, 2021).
[10] See id., https://www.mayoclinic.org/diseases-conditions/anemia/symptoms-causes/syc-20351360 (last visited Feb. 12, 2021).
[11] The administrative record does not contain a transcript of this hearing.

another hearing on September 14, 2017, at which Plaintiff, medical expert Minh D. Vu, M.D., and vocational expert John P. Kilcher testified. (Id. at 36-85.) On September 6, 2018, the ALJ issued a decision again finding that Plaintiff was not disabled. (Id. at 13-27.) Plaintiff requested a review of the ALJ's decision; the Appeals Council denied the request on September 4, 2019. (Id. at 1-3.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

### A.  Medical Evidence

Plaintiff has a complex medical history. In or about 2013, Plaintiff's doctor referred him to UCLA Health for genetic counseling and cancer risk assessment. (Id. at 863.) Dr. Erin O'Leary described Scott E.'s clinical history as follows:

> This patient is a [48-year-old] male with a long history of endocrine disease. He also has a history of cardiac arrhythmia, a possible diagnosis of Wolf-Parkinson-White syndrome, and is status post ablation for this. He was in good health until 2001 when he started to experience light sensitivity and dizziness. An MRI showed a vestibular schwannoma which was treated by gamma knife in 2003 at the University of Pittsburgh. In 2002, he started to experience [gastrointestinal] issues, headaches and joint pain and was found to have a thickening of his left adrenal gland and elevated cortisol. In 2005, he was diagnosed with a pituitary adenoma. He also reported testicular ependymal cysts. He has been seen by several endocrinologists over the years. Recently, he presented to Dr. [Avital] Harari as his mother was being worked up for hyperparathyroidism and he was noted to have thyroid nodules. He is also being worked up for this condition and also saw Dr. Heaney recently for further investigation related to ongoing endocrine issues as well as for other MEN1 tumor ma[r]kers. He recently has developed skin tags which may be related but have not been evaluated by a dermatologist. He is referred to me for consideration of genetic testing related to endocrine disorders.

(Id.)  In April 2014, Vivian Y. Chang, M.D., of UCLA Health, explained Plaintiff's Clinical Exome Sequencing[12] results:

> We discussed that the patient has a [heterozygous variant] of uncertain clinical significance (VSC) in the TSC1 gene.  Variants in the TSC1 gene are associated with autosomal dominant [Tuberous Sclerosis Complex type 1].  This variant was not inherited from the mother.  Tuberous sclerosis complex (TSC) is an autosomal dominant multisystem disorder characterized by hamartomas[13] in multiple organ systems, including the brain, skin, heart, kidneys, and lung.  Central nervous system manifestations include epilepsy, learning difficulties, behavioral problems, and autism. . . .  There is a wide clinical spectrum, and some patients may have minimal symptoms with no neurologic disability.  This patient has a [history of] schwannoma (rarely associated with TSC), renal cysts, skin lesions, endocrinopathies, thyroid nodules, pituitary lesion, adrenal gland thickening, and febrile seizure.

(Id. at 899; see also id. at 705-06.)  Dr. Chang recommended a plan of surveillance including a brain MRI every two years, evaluation for TSC-associated neuropsychiatric disorder ("TAND"), kidney MRI, renal function evaluation, dermatologic examination, and yearly follow-up with the Pediatric Cancer Predisposition Clinic at UCLA.  (Id. at 899-900.)

/ / /

/ / /

---

[12] Clinical Exome Sequencing "is a test for identifying disease-causing DNA variants within the [one percent] of the genome which codes for proteins (exons) or flanks the regions which code for proteins (splice junctions).  This test is intended for use in conjunction with the clinical presentation and other markers of disease progression for the management of patients with rare genetic disorders."  See UCLA Health, https://www.uclahealth.org/pathology/clinical-exome-sequencing#:~:text=Clinical%20Exome%20Sequencing%20is%20a,for%20proteins%20(splice%20junctions) (last visited Feb. 12, 2021).

[13] A hamartoma is a benign growth.  See National Institutes of Health, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hamartoma (last visited Feb. 12, 2021).

1   **B.    <u>Psychological Evidence</u>**

2         Notwithstanding his complicated medical history, Plaintiff's current challenge

3   focuses on the Commissioner's determination regarding Scott E.'s mental impairments.

4   There are two mental health evaluations in the record.  On January 10, 2015, Jay W.

5   Pope, Ph.D., a clinical psychologist, evaluated Scott E. using the TAND Checklist, which

6   Dr. Pope described as "a standard screening instrument" used to "assess the presence of

7   clinical symptoms and psychosocial problems that frequently occur with (or are

8   exacerbated by) tuberous sclerosis."  (<u>Id.</u> at 907.)  He noted:

> Results of this test, along with my clinical observations, suggest that
> although [Scott E.] does not suffer from all the disorders frequently
> associated with TSC (which often include Autistic Spectrum, Obsessive
> Compulsive, Pervasive Developmental, and Intellectual disorders), [Scott E.]
> does suffer from clinically significant symptoms associated with anxiety,
> depression, and ADHD[14]/executive dysfunction.  These symptoms include
> fatigue, lack of concentration, inattention, frequent irritability/anger, mood
> swings, aggressive outbursts, restlessness, impulsivity, and profound sleep
> disturbance.
>
> . . . .
>
> [Scott E.] is eager to seek appropriate medical treatment in order to
> enable him to return to work (he [was] previously employed as a machinist).
> He is also open to counseling in order to help him in his relationships.  This
> eagerness is additionally [fueled] by his hope that by receiving appropriate
> care he will be more informed as to how to best care for his son, who is
> significantly at risk for also developing tuberous sclerosis.  [Scott E.] has
> done extensive research on his illness and has been in contact with some of
> the world's leading researchers and physicians of this condition.  He
> presents as an appropriately concerned, highly insightful man, and comes
> across as earnest and genuine.  My current concern is that [Scott E.] does not
> appear to be able to perform many of the duties associated with employment,

---

[14] Attention-Deficit/Hyperactivity Disorder.  <u>See</u> Centers for Disease Control and Prevention, https://www.cdc.gov/ncbddd/adhd/facts.html (last visited Feb. 12, 2021).

> such as being able to drive, being able to fully care for himself, being able to manage pain effectively, being able to bounce back from days on which he attempts to work (severe muscular pain the day after), and being able to maintain the cognitive focus necessary for him to work effectively.

(Id. at 907-08.)

On May 31, 2016, Kenneth Lynch, J.D., Ph.D., conducted a psychological disability examination of Plaintiff at the request of the Department of Social Services. (Id. at 1023-28.) Dr. Lynch noted that Scott E. was "cooperative, responsive, alert and oriented to person, place and time" but "appeared to be in distress about multiple benign tumors apparently caused by Tuberous Sclerosis [Complex]." (Id. at 1023.) When asked about his psychiatric history, Plaintiff stated that he had seen a psychologist, Dr. Pope, for a "self-referred evaluation" but had not received any inpatient treatment. (Id. at 1024.) Scott E. stated that he was not taking any prescription medication. (Id. at 1025.) Dr. Lynch's mental status examination revealed normal attitude, behavior, contact with reality, speech, and memory, and an above average IQ score. (Id.) With respect to mood, Dr. Lynch observed that Scott E.'s reported history of distress, primarily depression, regarding his medical conditions satisfied the Diagnostic and Statistical Manual of Mental Disorders ("DSM V") criteria for Depressive Disorder Due to Medical Conditions and Illness Anxiety Disorder. (Id.) Plaintiff denied any current or past suicidal ideation. (Id.) He showed some difficulties with concentration and focus "due to his obsession about his medical conditions," but did not meet the criteria for attention deficit, hyperactivity disorders, or ADHD. (Id.) The psychologist also found that Scott E.'s judgment appeared to be restricted by a combination of his medical, pain, and mood conditions. (Id.) Plaintiff told Dr. Lynch that although he possessed a driver's license, he did not drive and his mother had driven him to the exam. (Id.) Dr. Lynch administered the Wechsler Adult Intelligence Scale, Wechsler Memory Scale, and Trail

Making Test, the latter of which measures rote memory and executive functioning.[15] (Id. at 1019, 1023, 1026.)

Dr. Lynch determined that Plaintiff was not able to sustain an ordinary routine without sustained support; concentrate for reasonable increments in order to maintain a regular work schedule; avoid normal hazards; function independently; sustain concentration, persistence, or pace; function outside highly supportive arrangements; manage benefits in his own best interest; use public transportation and travel to unfamiliar places; and adapt to the usual stresses encountered in work settings. (Id. at 1027-28.) But the doctor also found that Scott E. was able to socially interact with others at an age-appropriate level, understand instructions, complete simple tasks, complete detailed tasks, complete complex tasks, perform activities of daily living, and maintain social relationships. (Id. at 1027.) The psychologist also concluded that due to Tuberous Sclerosis Complex, anxiety, and depression, Scott E. had <u>mild</u> limitations in understanding and remembering simple instructions and carrying out simple instructions. (Id. at 1020.) Dr. Lynch found <u>moderate</u> limitations in making judgments on simple work-related decisions and interacting appropriately with the public and co-workers. (Id. at 1020-21.) He found that Plaintiff had <u>marked</u> limitations in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with supervisors, and responding appropriately to usual work situations and changes in a routine work setting. (Id.)

A mild limitation is a slight limitation in the area, but the individual "can generally function well." (Id. at 1020.) A moderate limitation is more than a slight limitation, "but

---

[15] See Science Direct, https://www.sciencedirect.com/topics/medicine-and-dentistry/trail-making-test (last visited Feb. 12, 2021).

8

the individual is still able to function satisfactorily." (Id.) And a marked limitation is a "serious limitation" in the area resulting in a "substantial loss in the ability to effectively function." (Id.)

**C.     ALJ's Decision**

On September 6, 2018, the ALJ issued a decision finding that Scott E. was not disabled. (Id. at 13-27.) Judge Iafe determined that Plaintiff had not engaged in substantial gainful activity since November 20, 2006, his alleged onset date. (Id. at 15.) He found that Plaintiff had severe impairments: a brain tumor/acoustic neuroma history, Multiple Endocrine Neoplasia 1 (MEN 1), endocrine cancer, pituitary adenoma, error calcium metabolic calcification, and chondrocalcinosis. (Id. at 16.) He also found that, singly or in combination, Plaintiff did not have impairments that met or medically equaled a listed impairment. (Id.) The ALJ further determined that Scott E. had the residual functional capacity to perform light work. (Id.) Plaintiff, however, could never climb ladders, ropes or scaffolds, and could only occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl. (Id.) He would also need to avoid concentrated exposure to temperature extremes and exposure to workplace hazards, such as unprotected heights and dangerous or fast-moving machinery. (Id.) The ALJ concluded that Plaintiff could not perform his past relevant work a machinist but could perform the requirements of representative occupations such as a hand packager, garment sorter, and stock checker. (Id. at 25-26.)

## II.     LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. 42 U.S.C.A. §§ 405(g), 421(d) (West 2011). The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'" Brawner v. Sec'y of Health & Human

Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions. Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020). The district court may affirm, modify, or reverse the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the Social Security Administration for further proceedings. Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011). An applicant must meet both requirements to be classified as "disabled." Id. The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

### III.   DISCUSSION

Plaintiff's sole argument is that the ALJ failed to articulate clear and convincing reasons to reject the uncontradicted psychological opinion of Dr. Lynch.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 4-10, ECF No. 24.)[16]  The Commissioner contends that

---

[16] Although Plaintiff contends in passing that the ALJ also improperly rejected Dr. Pope's opinion, his motion only addresses the ALJ's analysis of Dr. Lynch's opinion.  (See Pl.'s Mot. Attach. #1 Mem. P. &

11

substantial evidence supports the ALJ's evaluation of the evidence, including the opinion of Dr. Lynch.  (Def.'s Cross-Mot. Attach. #1 Mem. P. & A. 10.)

### A.  ALJ's Evaluation of Dr. Lynch's Opinion

The ALJ gave minimal weight to Dr. Lynch's opinion.  (Admin. R. 20-21, ECF No. 12.)  He explained:

> [I]t is found that his assessment is not consistent with his own findings in his examination of the claimant nor is it consistent with other evidence in the claimant's medical records as a whole.  For example, Dr. Lynch reported during the mental status examination, that the claimant displayed a normal affect with no signs of blunt or flat features.  Yet, he diagnosed the claimant with an anxiety disorder and a depressive disorder, despite the normal affect, the lack of mental health treatment, and the claimant's own report that he was not currently taking any prescription medications, including psychotropic medications.  Additionally, the claimant reported seeing psychologist Dr. Pope, but this was for a one-time evaluation and he was not receiving any ongoing mental health treatment from Dr. Pope or any other mental health professional.  These are just two of several inconsistencies in Dr. Lynch's report.

(Id.)

### B.  Applicable Standards

In determining whether a claimant is disabled, the ALJ must evaluate all medical opinions he receives.  20 C.F.R. §§ 404.1527(c), 416.927(c) (2019).[17]  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the

---

A. 7 n.7 ("[Plaintiff] only addresses the ALJ's reasons for rejecting Dr. Lynch's opinion."), ECF No. 24; Reply 3, ECF No. 26 (referring only to Dr. Lynch's opinion).)

[17] The standards for evaluation of opinion evidence are set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) for claims, such as Plaintiff's, filed before March 27, 2017.  See 20 C.F.R. §§ 404.1527, 416.927 (2019).

claimant's] physical or mental restrictions." Id. §§ 404.1527(a)(1), 416.927(a)(1). If, as here, the ALJ does not give controlling weight to a treating physician's opinion, the ALJ is to consider the following factors when deciding the weight to give to any medical opinion: the examining relationship, treatment relationship, length of the treatment relationship and the frequency of examination, supportability of the medical opinion (through evidence and explanation), consistency of the opinion with the record as a whole, the medical sources's specialization, and other factors. Id., §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

Cases in the Ninth Circuit distinguish among three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) nonexamining physicians, who neither examine nor treat the claimant. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating physician than to the opinions of doctors who do not treat the claimant. Id. (citation omitted). An examining physician's opinion, in turn, is generally entitled to greater weight than a nonexamining doctor's opinion. Id. (citation omitted). When a treating or examining doctor's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons that are supported by substantial evidence. Id.; see also Ryan v. Comm'r of Soc. Sec. Admin., 528 F.3d 1194, 1198 (9th Cir. 2008). If the opinion of a treating or examining physician is contradicted, it may be rejected only for "specific and legitimate" reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830-31 (citation omitted); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). The ALJ is not required to accept the opinion of any physician, including that of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (citation omitted); see also Ford, 950 F.3d at 1154.

There is no indication in the record that Plaintiff Scott E. received mental health treatment; therefore, no treating physicians addressed his mental functional capacity. As summarized above, two examining physicians, Drs. Lynch and Pope, conducted psychological evaluations of Plaintiff. Because Dr. Lynch's opinion regarding Plaintiff's mental functional capacity was not contradicted, the ALJ could reject the opinion only by articulating "clear and convincing" reasons for doing so. Lester, 81 F.3d at 830.

## C.     Plaintiff's Arguments

In support of the ALJ's assertion that Dr. Lynch's opinion was inconsistent with the doctor's examination findings as well as the other medical evidence, ALJ Iafe observed that Plaintiff exhibited "normal affect with no signs of blunt or flat features" on examination, lacked mental health treatment, was not taking any prescription medications, including psychotropic medications, and had seen Dr. Pope on only one occasion. (Admin. R. 20-21, ECF No. 12.) Plaintiff makes several arguments as to why the ALJ's finding of "inconsistency" did not constitute a clear and convincing reason to give minimal weight to Dr. Lynch's opinion. (Pl.'s Mot. Attach. #1 Mem. P. & A. 8-10, ECF No. 24.)

Scott E. first contends that Dr. Lynch properly diagnosed Depressive Disorder Due to Medical Conditions and Illness Anxiety Disorder under the DSM V criteria by relying on his own observations and the patient's reported history. (Id.) Plaintiff infers that the ALJ erred by not recognizing that diagnoses of mental health conditions may be based on "the relative imprecision of the psychiatric methodology[,]" which includes observations by a trained psychiatric professional. (See id. at 8-9, citing Thompson v. Astrue, No. ED CV 09-2255-PLA, 2011 WL 164323, at *8 (C.D. Cal. Jan. 19, 2011).) In Thompson, the court found that the ALJ erred by rejecting treating physicians' opinions regarding the plaintiff's mental condition because they were "not sufficiently supported by objective findings." Thompson, 2011 WL 164323, at *7-8. Unlike the ALJ in Thompson, the ALJ

here did not discount Dr. Lynch's opinion due to the absence of objective findings or because Dr. Lynch's testing methods were inadequate. Rather, Judge Iafe found that the results of Plaintiff's mental status examination, including his "normal affect with no signs of blunt or flat features," were inconsistent with Dr. Lynch's findings of a disabling mental impairment. (Admin. R. 20, ECF No. 12.) The ALJ could properly discredit Dr. Lynch's opinion on this basis. See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (finding discrepancy between doctor's recorded observations and opinions regarding patient's capabilities a "clear and convincing" reason to not rely on the doctor's opinion).

Plaintiff next argues that without a supporting medical opinion, the ALJ was not qualified, as a layperson, to determine the adequacy of Dr. Lynch's examination and diagnoses, and was not entitled to substitute his judgment for the opinion of a medical professional. (Pl.'s Mot. Attach. #1 Mem. P. & A. 9, ECF No. 24; Reply 3-4, ECF No. 26.) This argument is without merit. The Commissioner's regulations specifically direct the ALJ to evaluate all medical opinion evidence according to certain factors, including its consistency with the record as a whole. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). The ALJ is also required consider the degree to which a medical opinion is supported by other evidence in the record. Id. §§ 404.1527(c)(3), 416.927(c)(3). "The fulfillment of [this] regulatory dut[y] is not tantamount to rendering a medical opinion." See King v. Comm'r Soc. Sec. Admin., No. CV-19-05669-PHX-SPL, 2020 WL 5587429, at *5 n.12 (D. Ariz. Sept. 18, 2020). The ALJ could properly assign minimal weight to Dr. Lynch's opinion under the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927, and doing so cannot be construed as the ALJ making an independent medical finding. Plaintiff's reliance on Jackson v. Colvin, Case No. CV 16-1635 JC, 2016 WL 7480239 (C.D. Cal. Dec. 29, 2016), in arguing that the ALJ was not entitled to substitute his judgment for that of a medical expert, (see Reply 4-5, ECF No. 26), is misplaced. In

that case, the court found that the four reasons articulated by the ALJ for rejecting the Plaintiff's psychological test results were not specific and legitimate, let alone clear and convincing, because the ALJ failed to accurately portray the evidence in the record or provide evidentiary support for his assertions. See Jackson, 2016 WL 7480239, at *4-5. Here, by contrast, the ALJ's analysis of the record does not lack either accuracy or support.

Third, Plaintiff contends that his lack of mental health treatment and utilization of psychotropic medication did not constitute substantial evidence supporting the ALJ's finding that Dr. Lynch's opinion was inconsistent with the medical records as a whole. (Pl.'s Mot. Attach. #1 Mem. P. & A. 9, ECF No. 24.) Plaintiff relies on Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294 (9th Cir. 1999), in which the Ninth Circuit "criticized the use of a lack of treatment to reject mental complaints . . . because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" Id. at 1299-300 (citing Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)). Although Reginnitter and Nguyen condemn using the lack of mental health treatment against a claimant, there is no indication here, as in those cases, that Plaintiff's not seeking of mental health treatment was attributable to a lack of resources or a psychological condition. To the contrary, the evidence establishes that Scott E. regularly sought treatment for his physical ailments, including from specialists at UCLA, UCSD, and Mayo Clinic, (see Admin. R. 1032, 1041, 1109, ECF No. 12), and nothing in the record suggests that Scott E.'s mental condition prevented him from seeking mental health treatment. Moreover, it appears that it was unclear to the ALJ whether Dr. Lynch understood that Plaintiff had seen Dr. Pope on only one occasion, hence the ALJ's finding that Dr. Lynch's report was "inconsistent" on this point. (Id. at 21.) The ALJ could properly consider Dr. Lynch's knowledge of Plaintiff's treatment history in his evaluation of Dr. Lynch's opinion. See 20 C.F.R. §§ 404.1527(c)(6),

419.927(c)(6) ("[T]he extent to which a medical source is familiar with the other information in [the claimant's] case record [is a] relevant factor[] that we will consider in deciding the weight to give to a medical opinion.").

### D.  ALJ Properly Discounted Dr. Lynch's Opinion

The ALJ was required to articulate clear and convincing reasons supported by substantial evidence to discount Dr. Lynch's opinion.  He did so here.  The ALJ's observation that Plaintiff's mental status exam was essentially normal was supported by substantial evidence in the record.  (See Admin. R. at 1025, ECF No. 12.)  The explanation offered by Dr. Lynch to support his opinion that Plaintiff had significant psychological limitations, including the inabilities to sustain an ordinary routine without sustained support and to function independently, was not based upon significant findings in his mental status examination but rather relied upon Scott E.'s reported history of distress concerning his medical conditions.  (Id.)  The ALJ could find that this decreased the "supportability" of Dr. Lynch's opinion.  See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.")  Additionally, Dr. Lynch provided no specifics and no explanation regarding Plaintiff's reported history of distress, including depression, which could also lessen the supportability of the psychologist's opinion.  See id. ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

The inconsistency of Dr. Lynch's opinion with the record as a whole also provided a basis for Judge Iafe to give the doctor's opinion minimal weight under 20 C.F.R. §§ 404.1527 and 416.927.  The evidence in the record was not consistent with Dr. Lynch's belief that Plaintiff did not drive or that he could not sustain an ordinary routine without sustained support.  As the ALJ noted in his decision, Plaintiff testified that he was the

caregiver for his son, who was nine years old at the time.  (See Admin. R. 19, ECF No. 12; see also id. at 92 (Plaintiff's testimony that he and his son lived alone); id. at 46 (hearing testimony by Plaintiff that he shared joint custody of his son, prepared his meals, and drove him to school).  The ALJ further observed that adult function reports completed by Plaintiff and his mother conflicted with Dr. Lynch's restrictive findings.  See id. at 21 (citing id. at 396-403, 420-27 (indicating that Scott E. cared for his son, prepared meals, performed household chores, and paid his own bills).)

In sum, the ALJ properly reviewed the evidence and articulated clear and convincing reasons supported by substantial evidence in the record to discount Dr. Lynch's opinion.

### IV.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  February 16, 2021

Hon. Ruben B. Brooks
United States Magistrate Judge